The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. As the appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner as follows:
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Key Risk Management Services is the servicing agent for the self-insured employer Mercy Health Services. Aetna Insurance Company is the carrier on the risk for Host Marriot.
4. Plaintiff's average weekly wage at all relevant times was $346.00, yielding a compensation rate of $238.68.
5. Plaintiff sustained a compensable occupational disease on or about 10 August 1992, while employed with defendant-employer Mercy Health Services.
6. Medical records consisting of a packet of 46 pages were submitted into evidence.
***********
Based upon all of the competent evidence of record and reasonable inferences drawn therefrom, the undersigned makes the following additional
 FINDINGS OF FACT
1. At the date of the hearing before the Deputy Commissioner in this matter, claimant Brenda Hankins was a 44 year old woman.
2. Plaintiff had been working as a executive secretary for defendant Mercy Hospital when she developed her compensable bilateral carpal tunnel syndrome.
3. Plaintiff had surgery on her right hand to correct her carpal tunnel syndrome in 1992. After the surgery, plaintiff developed extreme pain and other problems with her right hand.
4. Defendants Mercy and Key Risk filed a Form 21 dated 26 January 1993, initiating compensation to plaintiff for her condition.
5. In January 1993, plaintiff came under the care of Dr. Stephen Naso and was diagnosed with reflex sympathy dystrophy (RSD). Plaintiff's RSD developed as a result of her surgery to her right hand for carpal tunnel syndrome and was a direct sequela of her compensable condition.
6. Dr. Naso was authorized by defendants to treat plaintiff and saw her for her RSD from January 1993 through August 1994. On 7 September 1993, Dr. Naso found plaintiff to be at maximum medical improvement and rated her with a 15% permanent impairment to the right hand. By December 1993, plaintiff's right hand was better but she continued after that date to have pain and difficulty using her hand.
7. According to a Functional Capacities Evaluation performed in September 1993, plaintiff's restrictions were that she should not have any continued or extended use of her hands such as typing or writing, and should have frequent breaks. She could not carry more than 11 pounds with her right hand. Dr. Naso additionally stated that she should not perform any jobs involving any repetitive use of her hands, or that involved heavy lifting or cold temperatures.
8. Plaintiff made several efforts to return to some type of employment with defendant Mercy during fall of 1993 and spring of 1994. Because these jobs required repetitive motion which caused plaintiff to experience pain in her hand, plaintiff was unable to continue in these positions. During this period, defendants Mercy and Key Risk paid plaintiff for periods of temporary total and temporary partial disability.
9. Beginning in spring 1994, plaintiff sought employment with other employers with the assistance of Terri Cochran, a vocational rehabilitation specialist. Ms. Cochran observed that plaintiff worked very hard to return to work. After many positions were found to be inappropriate, plaintiff was employed by defendant Host Marriott to work in a coffee/gift shop called Starbucks at the Charlotte airport beginning 3 May 1994. The Starbucks store was new and no job description was ever provided to Dr. Naso for approval.
10. After plaintiff completed training and started the Starbucks job, she initially was required to make coffee with an espresso machine, which required her to lift heavy containers, use her hands in a repetitive fashion, and handle hot items. Plaintiff immediately developed problems with her right hand and was reassigned that same day to work in the gift shop area.
11. For the remainder of her employment with Host Marriot, plaintiff's job duties were working in the gift shop primarily operating the cash register. Plaintiff had to use the fingers of her right hand to operate the cash register. She experienced increased pain with her hands doing that job and in mid-June expressed her concern to Ms. Cochran that her ability to perform the job was lessening, and thus affecting her status as an employee.
12. Beginning approximately early July 1994, plaintiff's supervisors attempted to modify the cashier job by allowing plaintiff to work two days on and one day off. The modified schedule gave plaintiff temporary relief. On 6 July 1994, vocational services were discontinued. After that date, however, plaintiff again had increased pain and problems with her right hand so that her supervisors gradually cut her hours in order to alleviate her problems. Plaintiff eventually was no longer offered any hours by defendant Host Marriot.
13. Plaintiff returned to see Dr. Naso several times while employed with defendant Host Marriot. On 23 May 1994, Dr. Naso gave plaintiff a permanent impairment rating of 5% for her left hand carpal tunnel syndrome. Dr. Naso released plaintiff from further treatment in August 1994, but stated that plaintiff's symptoms could worsen depending on her activities and further treatment might be appropriate.
14. Dr. Naso never reviewed a description of the cashier position with Host Marriot, but was of the opinion that plaintiff's RSD would prevent her from doing any kind of work that involved a great deal of repetitive use of her hand. Dr. Naso felt that her work at Host Marriot could aggravate or augment her RSD symptoms. Dr. Naso could not say that the cashier work would augment the underlying RSD condition. According to Dr. Naso, plaintiff's left carpal tunnel syndrome might have been augmented by her job with defendant Host Marriot but he could not say that that position definitely augmented plaintiff's carpal tunnel syndrome. Rather, he stated that almost any activity with her left hand could have placed plaintiff at increased risk of having more problems with the left carpal tunnel syndrome.
15. Plaintiff was treated by Dr. Marc Guerra from May 1994 through September 1994. Plaintiff sought treatment by Dr. Guerra because she wanted more information about the RSD and was having problems with pain. Defendants did not authorize treatment with Dr. Guerra. Dr. Guerra did further evaluation and recommended more physical therapy.
16. Dr. Guerra was also of the opinion that the cashier work with Host Marriot aggravated plaintiff's right RSD symptoms and stated that the job was too repetitive for plaintiff to perform. Dr. Guerra could not state that the cashier job aggravated or augmented the underlying RSD. He did not take plaintiff out of work.
17. Plaintiff next sought medical treatment for her RSD and continuing pain from other doctors. She presented to doctors at North Carolina Memorial Hospital for management of her RSD beginning in December 1994. Defendants did not authorize this treatment. Plaintiff was treated primarily by Dr. Sunil Dogra, who managed medications including nerve blocks. Over the course of several months of treatment, plaintiff obtained some relief. Dr. Dogra wrote notes keeping plaintiff completely out of any kind of work for March and April 1995.
18. Plaintiff also was treated by Dr. Paul Tawney at UNC, who arranged for another vocational evaluation, occupational therapy and pain management. During treatment with Dr. Tawney, plaintiff's range of motion and strength improved and her pain decreased somewhat.
19. According to Dr. Tawney, plaintiff's restrictions were due both to pain and to deconditioning, and that the pain contributed to the deconditioning. Dr. Tawney stated that plaintiff was limited in her ability to perform repetitive motion work, but otherwise had no functional limitations on her ability to return to work.
20. After her work with Host Marriot, plaintiff performed telemarketing from home for a few weeks at approximately $63 per week. Plaintiff has obtained, but not maintained, some full time employment since the hearing before the Deputy Commissioner.
21. As of August 1994, defendant Mercy was paying plaintiff temporary partial disability at $108.01 per week. Defendant Mercy continued to pay that amount in TPD through the date of the hearing.
22. Medical treatment of plaintiff by Drs. Tawney, and Dogra, and treatment at North Carolina Memorial Hospital, was necessary to reduce plaintiff's pain and lessen her disability.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's RSD is a direct result of the surgery for her bilateral carpal tunnel syndrome, and is therefore compensable. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's employment at defendant Host Marriot did not augment plaintiff's right RSD or her bilateral carpal tunnel syndrome to any degree, however slight, and does not constitute last injurious exposure to the hazards or the RSD or carpal tunnel syndrome. Defendants Mercy Hospital and Key Risk are liable for any additional compensation due plaintiff for her bilateral carpal tunnel syndrome and right RSD. N.C. Gen. Stat. § 97-57.
3. Because the parties executed a Form 21 in this case, plaintiff was entitled to a presumption that she continued to be disabled until defendant met its burden to show that the plaintiff became employable. Brown v. S N Communications,Inc., 124 N.C. App. 320, 330, 477 S.E.2d 197 (1996). Defendants have met their burden by showing that plaintiff was actually employable in her job with defendant Host Marriot, making the same or lesser wages than before her injury.Franklin v. Broyhill Furniture Inds., 123 N.C. App. 200,209, 472 s.E.2d 382 (1996). Thereafter, the burden shifted back to plaintiff to show that she continued to remain disabled.Id. Plaintiff has failed to meet this burden.
4. As a result of her RSD and bilateral carpal tunnel syndrome, plaintiff is entitled to temporary partial disability compensation based upon the difference between her pre-injury wages and the wages earned at Starbucks. As of 5 January 1995 when plaintiff left the employ of Starbucks, defendant is not responsible for continuing compensation, with the exception of the two month period in March and April 1995 during which she was written out of work by Dr. Dogra. To the extent that compensation was continued during any period otherwise not authorized under this paragraph, defendants are entitled to a credit. N.C. Gen. Stat. §§ 97-29; 97-30; 97-42.
5. As a result of her compensable conditions, plaintiff is entitled to have defendants Mercy Hospital and Key Risk pay all medical expenses incurred with Dr. Tawney, Dr. Dogra and North Carolina Memorial Hospital, or to be incurred, when approved by the Industrial Commission, which would or will give plaintiff relief for her compensable conditions, when such treatment would tend to lessen the period of disability or give relief to her pain, Little v. Penn Ventilator Co., 317 N.C. 206,345 S.E.2d 204 (1986), specifically including treatment by North Carolina Memorial Hospital, Dr. Dogra, and Dr. Tawney.
***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Plaintiff's claim against defendants Mercy Hospital and Key Risk for workers' compensation benefits for disability arising from RSD is granted.
2. Defendants Mercy Hospital and Key Risk are directed to pay temporary partial disability benefits for the period of time during which plaintiff was employed by Starbucks. Defendants are further required to pay temporary total disability payments for March and April 1995 during which time plaintiff was written out of work by Dr. Dogra. Any amount under this paragraph which remains owing by defendants shall have deducted from it any temporary partial disability payments made by defendants between 5 January 1995 and the present. Any remaining amount still owed to plaintiff following said deductions shall be paid in a lump sum subject to attorney's fees as described below.
3. Defendants Mercy Hospital and Key Risk are directed to pay all medical expenses incurred or to be incurred by plaintiff as a result of her bilateral carpal tunnel syndrome or right RSD, specifically including from North Carolina Memorial Hospital, Dr. Tawney and Dr. Dogra, as soon as bills for the same have been submitted to the defendants and approved pursuant to procedures established by the Industrial Commission.
4. A reasonable attorney's fee or 25 percent of the compensation due plaintiff is approved for plaintiff's counsel. This fee shall be deducted and paid directly to plaintiff's counsel.
5. Defendants Mercy Hospital and Key Risk shall pay the costs of this action.
This the ___ day of April, 1999.
 S/_________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING IN PART AND DISSENTING IN PART:
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DCS/jbd